## STATE OF TEXAS v. SAN ANTONIO & ARANSAS PASS RAILWAY COMPANY.

### Decided April 1, 1903.

**1.—Railroads—Unjust Discrimination—Compressing Cotton—Foreign Shipment.**

In an action by the State brought under the statute providing a penalty for unjust discrimination by a railroad between shippers (Rev. Stats., art. 4574) and the rule of the Railroad Commission requiring local shipments of cotton to be compressed at the first compress en route, a case is not made out by evidence showing that a cotton buyer concentrated his foreign shipments at Houston, Texas, and there classified and graded them and compressed the cotton preparatory to final shipment, and in so doing took certain bales of cotton out of one foreign shipment and substituted them for an equal number in another, changing the marks, etc., as this did not change the character of the shipments from foreign to local ones so as to require that the cotton should have been compressed at the first compress en route.

**2.—Same—Notice to Carrier.**

Evidence held not sufficient to charge a railway company with notice that a shipper whose cotton it was transporting under a foreign bill of lading in-

tended to so deal with and change the cotton at Houston as to make the shipment in legal effect a local one, coming within requirement that the cotton should be compressed at the first compress on the route.

Appeal from the District Court of De Witt. Tried below before Hon. James C. Wilson.

*C. K. Bell,* Attorney-General, *T. S. Reese,* and *W. J. Baker,* for appellant.

*Davidson & Bailey,* for appellee.

JAMES, CHIEF JUSTICE.—This suit was brought by direction of the Railroad Commission of Texas against appellee to recover penalties for alleged violations of article 4574, section 1, Revised Statutes (unjust discrimination), and of the regulations of the commission concerning the compressing of cotton at the first compress en route from origin to destination of the shipment when same is to be compressed in transit. The cotton in question, 100 bales, was shipped by A. Breyer from Yorktown, Texas, on defendant's line, to Bremen, Germany, on a through rate under export bill of lading, via Houston and Galveston, Texas, the same to be compressed at Houston. The petition alleged that Breyer, being desirous of concentrating said 100 bales at Houston for the purpose of marking, classing, grading, weighing and preparing same for market and for the purpose of determining its final destination, did not class, grade or otherwise prepare said cotton for market otherwise than to mark same at Yorktown with mark D. O. R., and had not, while at Yorktown, determined its final destination. That for the purpose of evading the regulations of the commission requiring said cotton to be compressed at the Cuero cotton compress (the first compress in transit) determined to ship it to Houston, passing said compress, upon pretended export bills of lading, and on September 3, 1900, applied to defendant for and obtained such bills of lading, and thereunder caused it to be carried from Yorktown through Cuero and by said compress to Houston. That when it arrived at Houston it was placed on the platform of the Bayou City compress, and while still in the hands of defendant and upon previous understanding with defendant, Breyer's employes went upon said platform and classed, graded, weighed and remarked said cotton, changing the original marks D. O. R. on 38 of the bales and placing other marks thereon, separating such 38 bales from the remainder of the said 100 bales, and replacing or substituting said 38 bales with 38 others taken from cotton which had arrived at said compress from Hallettsville, Texas, under other bills of lading and marks, on which they placed the mark D. O. D. That the 100 bales thus formed were compressed. That thereafter said 100 bales were delivered by defendant to the Texas & New Orleans Railway Company as being the identical cotton which it had transported from Yorktown, and were shipped out from Houston under other and different export bills of lading than those issued at Yorktown, and transported outside of the State.

That said 100 bales were originally consigned to "F. Kraege, Bremen, Germany, notify A. Breyer," but the cotton thus marked D. O. R. which left Houston and which purported to be the same cotton, but which was not was consigned to "E. M. Noble, Bremen, Germany, notify C. A. Gruner & Co."

That the agents of the defendant company at the time of and before the receipt by them of said 100 bales delivered to them at Yorktown by Breyer's agent, had notice that it was the intention of Breyer to apply to defendant's agent at Yorktown for export bill of lading for said 100 bales of cotton to enable him to take the same to Houston for compression and there to be classed, graded, weighed and otherwise prepared for market, and there to determine its final destination, and that portions of said cotton would be taken out and other cotton substituted therefor; that the plan was resorted to by Breyer to enable him to pass the Cuero compress, and that with full knowledge of the intention of said Breyer, as aforesaid, the defendant issued to him export bills of lading, contriving and intending thereby that the same should be used as a device and cover to evade the compress regulations of the Railroad Commission. That said regulations required cotton shipped from Yorktown to Houston to be stopped at Cuero for compression, there being a compress at said point in operation at the time, and that being the first compress on defendant's line between Yorktown and Houston.

The cotton was shipped on a bill of lading calling for delivery at Bremen, Germany, and was claimed by defendant to be an export shipment and not subject to the aforesaid regulations.

The petition alleges that, notwithstanding the form of the bill of lading, the cotton was a local shipment from Yorktown to Houston by reason of the fact that it was the intention of the shipper, known to defendant's agent, to stop the cotton at the Bayou City compress at Houston, there to be compressed, weighed and classed and graded, and its destination fixed, and to make substitution of the cotton, thereby changing its identity.

Defendant answered by voluminous exceptions and pleas to the jurisdiction, and exceptions to the merits, which were overruled. Defendant answered further by general denial, and specially denied any notice or knowledge as to Breyer's intentions with regard to the handling of the cotton at the Bayou City compress at Houston, and denied its power to prevent or in any way interfere with the handling of the cotton at the compress, or its responsibility therefor. The defendant alleged that the shipment was a bona fide export shipment and as such not subject to the compress regulations of the Railroad Commission of Texas.

The court instructed the jury to find for defendant.

Appellant makes two assignments of error which are as follows: "The court erred in instructing the jury to find a verdict for the defendant, and in refusing to submit to the jury the issues presented by the pleadings and the evidence. If Breyer intended at the time of the shipment of the cotton in question to stop it at the Bayou City compress, at Houston,

there to remark, reweigh, grade and classify it, and to substitute for the cotton shipped from Yorktown other cotton so as to make a shipment of 100 bales of uniform grade before the same was shipped out from Houston, and afterwards did so, then the shipment from Yorktown to Houston was a local shipment, and subject to the compress regulations of the Railroad Commission, and if the defendant's agent knew or had notice at the time of or before the receipt of said cotton for shipment that such was Breyer's intention, they were required to treat the shipment as a local shipment under the said compress regulations and to stop it at the Cuero compress for compression, and this issue should have been submitted to the jury under the evidence introduced, which was sufficient to authorize finding for plaintiff."

"The court erred in refusing to give to the jury the instructions asked by the plaintiff. The evidence raised issues of fact which should have been submitted to the jury with regard to the manner in which the cotton was handled by Breyer at the compress in Houston, the intention of Breyer at the time of the shipment to handle the cotton in this way, and the notice to the defendant's agents at and before the receipt of the cotton for shipment as to Breyer's intentions, which issues of fact, if found for the plaintiff, would have constituted the shipment a local and not a foreign and interstate shipment, and would have required a verdict for the penalties sued for, and the evidence was sufficient to authorize a finding for the plaintiff on these issues."

The contentions of the State are substantially, first, that the shipment to Houston was a local one—rendered so by the facts and circumstances, notwithstanding it went shipped under an export bill of lading—and that it was really a foreign shipment only from Houston; second, that defendant knew, or was put on notice, of the domestic character of the shipment from Yorktown to Houston.

The testimony on all material matters is undisputed. A. Breyer was a buyer of cotton for shipment abroad. The 100 bales in question he purchased and shipped on a through rate from Yorktown, Texas, via Houston and Galveston, Texas, to Bremen, Germany, to be compressed at Houston, under an export bill of lading and consigned "to order of F. Kraege, notify A. Breyer." F. Kraege was a merchant of Yorktown, Texas, from whom Breyer bought the cotton, and on September 3d, the date of the shipment, the purchase price was unpaid. Therefore it was made to the order of Kraege, to whom the bill of lading was delivered, and who sent it with his blank indorsement to H. Runge & Co. at Cuero for collection, where the draft was paid and the bill of lading forwarded to Breyer on the 4th. The first compress out from Yorktown was the Cuero cotton compress, and the cotton went on to Houston without stopping there. When this cotton arrived at Houston and was delivered to Bayou City compress, Breyer had there a lot of cotton which he had acquired at Hallettsville, Texas, and which was under like export bills of lading being conveyed in like manner to Bremen, Germany. The stoppage and collection of all this cotton by Breyer at Houston, where Breyer had his office,

clerks and facilities, was for the purpose of compressing and classifying it, etc. The alleged substitution (what the evidence shows to be classification) while the cotton was at the compress, consisted in Breyer taking 38 bales from the Yorktown lot and 38 bales from the Hallettsville lot and substituting one lot in place of the other, thus classifying the cotton—that is, getting cotton of uniform grade in one lot and under one bill of lading. Incidental to this the marks on the bales were changed. All the bales thus handled and shifted from one bill to another were the cotton of Breyer, and were under export bills of lading calling for the same foreign port of destination; no other cotton figuring in the transaction, and all the cotton thus collected at that time and place had been purchased by Breyer and went forward in due course to Bremen.

Although appellant in the petition seems to base the action to some extent upon fact or circumstance that the original bill of lading was taken up at Houston, and that defendant issued another export bill of lading for the cotton in question from Houston to Bremen via New Orleans, instead of Galveston, with change of consignee to "E. M. Noble, notify E. C. Gruner & Co.," appellant does not in his brief seem to be relying on said facts. Nevertheless we probably should state the evidence in regard to this. While the cotton was in the compress at Houston, the storm of September 8, 1900, occurred which destroyed Galveston's commerce for the time being. The steamer Heligoland, on which Breyer had a contract for ocean carriage, and had been engaged by him to carry these lots of cotton to Europe, and which was due to arrive on the 10th, arrived at Galveston on the 11th, and finding the condition of things there put out from Galveston on the 13th, after notifying Breyer. This necessitated the routing of the cotton to New Orleans by what was in that emergency known as "distress shipments," and the common practice in such cases was to issue new bills of lading. In fact in ordinary circumstances the original bill of lading would customarily be taken up at Galveston, and "a port side" bill of lading issued by the ship covering all cotton belonging to one person on that ship. There was no change of destination, and although we regard the change in the name of the consignee in the bills of lading as of no importance in determining whether the shipment from Yorkton to Houston was domestic, or a part of a foreign shipment, we may add that the evidence is that Breyer held the original bill of lading with F. Kraege's blank indorsement thereon, making him the real owner; and E. M. Noble, the consignee named in the new bill of lading, was Breyer's clerk and representative, and the cotton was really consigned "to the order of A. Breyer, notify A. C. Gruner & Co." A. C. Gruner & Co. were his correspondents in Bremen.

The above facts are all that need be stated to arrive at what in our opinion is the proper disposition of the case. Appellant's complaint is that there was certain evidence which should have carried the case to the jury, and this evidence we shall refer to in the opinion.

*Conclusions of Law.*—1. We take it for granted that no one will insist

that the stoppage of cotton en route for compression alone would transform a foreign billed shipment into a domestic one. Appellant appears to contend that classification, reweighing and remarking had that effect on this shipment. Breyer's place of business was in Houston; he was engaged in buying cotton at different points in the State for export. He clearly had the right to compress, also to classify and grade his purchases according to the requirements of the particular consignment he desired to make, also he had a right to ship cotton from the points of purchase by foreign bills of lading. It is also clear that he could not classify and grade several lots of cotton bought at different points without collecting them at some point. And to our minds it is clear also that the act of classifying, as it was done in this instance, at a central point on the lines of these several shipments, was not in any sense an act of preparation or perfection of the cotton for market. Nothing was done to the article itself but to compress it, and as compressed it went on. It was already destined abroad, that is all the lots of cotton from which the substitutions were made were under export bills to the same destination, and all were actually exported, and we think it should be held under the circumstances that the mere shifting of bales from one bill of lading to another was immaterial and did not interrupt the foreign nature of the several shipments.

One of the regulations of the commission seems to recognize that cotton may be concentrated through shipments at some point and there classified, without constituting such shipments domestic, unless in addition to such concentration and classification preparatory to final destination it is brought to that point to determine the point of final destination. Sec. 4, Commodity Tariff, I-B, 6th Annual Report Railroad Commission of Texas, p. 48. And it is uncontroverted that the final destination of this cotton was determined before the cotton was started from Yorktown. This appears to signify that in the opinion of the commission a foreign shipment does not lose that character by a classification of cotton en route. And it has been held that coal mined in a State and started to another State, but stopped for separation and assortment, does not thereby lose its character as an interstate shipment. State v. Engle, 34 N. J. Law, 425. We conclude that none of the said acts was sufficient to transform this into a local shipment.

2. The testimony was that at the time of this transaction Breyer was and had been engaged exclusively in buying cotton to export abroad. The penalties sought to be imposed are against appellant carrier for not stopping the 100 bales for compression at Cuero. It seems to us at the start that it can not be held liable for not stopping there, unless it knew that this cotton was not being bona fide billed for a foreign port,—in other words, that, notwithstanding the form of the shipment, it knew that the cotton, or some of it, was not intended for exportation. There is no testimony that would sustain such a conclusion. If Breyer had admitted to appellant that he did not intend to export the cotton, or had so declared to appellant's knowledge, or had admitted or declared, to defendant's

knowledge, that he intended to do certain things with the shipment at Houston which would be inconsistent with its interstate or foreign status and constitute it a local shipment to Houston, defendant's duty to stop the cotton at Cuero could well be claimed. Defendant, however, could not foresee what would happen to it after it reached Houston, hence it must have had previous knowledge of what was to be done with it there, or unmistakable notice of what was to be done with it, in order to de-volve upon it the responsibility of stopping the cotton at Cuero in opposition to Breyer's wishes to have it compressed at Houston. The responsibility was a grave one to defendant, as in either event it would incur liability, if mistaken; and therefore it ought not be held liable for the penalties sued for unless it had information more definite than a vague suspicion that Breyer was using a foreign bill of lading in order to evade the laws of the State in reference to local commerce.

3. There was not a particle of evidence that Breyer, in making the shipment, had any intention of doing anything except what was actually done with it at Houston. Certainly what he did was the best evidence of what his intention was, and in view of it, the mere suspicions on the subject which the president of the Cuero compress imparted to defendant ought not to count at all. But if he had the intention to substitute some of the 100 bales with local cotton, or to use some of it for local purposes, it would amount to nothing when it conclusively appears that he did nothing of the kind. It was shown that the president of the compress at Cuero, upon learning that Breyer was about to make this shipment, and after failing to get him to agree to give it to his compress, called up defendant's agent by telephone and insisted on having the cotton and told him that he was confident from Mr. Breyer's statement to him that the cotton was going to be changed, its identity destroyed, etc., and asked defendant to see that his compress got it. The same witness detailed the conversation he had had with Breyer, from which it appears that all Breyer had told him was that he wanted to work the cotton at Houston and would take it there. And in view of the witness' apprehensions defendant actually exacted a promise from Breyer that he would not "substitute cotton."

This information, which only purported to be the suspicion of the witness, and which the event demonstrated was an unfounded suspicion, together with another fact stated by the same witness, that some time previous to this shipment he had, in going over some claims against the Yorktown and Cuero compresses, observed a lot of cotton upon which the marks had been changed, and yet the defendant had paid for compressing the cotton, constitute all the evidence that could possibly be relied on to show that defendant was aware that Breyer intended to improperly substitute cotton in the present transaction. Its sufficiency for that purpose in connection with the other evidence is too patent to require further discussion.

After all it is immaterial what Breyer *might* have done with this cotton at Houston. It does not matter what he meant by saying that he

intended to work it at Houston, when what he did with it there was merely to classify and grade it along with other bales similarly destined. It matters not that he may have promised defendant's agent that he would not substitute cotton, if what he actually did in that respect was permissible in such shipments. The surrender of the original bill of lading and the issuance of the new one from Houston by way of New Orleans as we have explained this, if it could possibly be held that it operated to transform the shipment into a local one, was something which neither the defendant, nor even the president of the Cuero compress could have anticipated.

We conclude, therefore, that the undisputed evidence established that this shipment was from its origin to the time it left the State a foreign shipment. Also that the shipper did not have any design in this entire matter except in good faith to export the cotton according to the bills of lading, and that neither facts nor notice existed which would have warranted defendant in disregarding the shipper's instructions to deliver this cotton for compression at Houston. Affirmed.

*Affirmed.*